1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

BGH HOLDINGS LLC, *et al.*,

Case No. C18-1408RSL

10

Plaintiffs,

ORDER ON SUMMARY
JUDGMENT

11

v.

12

D.L. EVANS BANK,

13

Defendant.

14

15     This matter comes before the Court on defendant's "Renewed and Amended Motion for
16  Summary Judgment" (Dkt. # 158) and plaintiffs' "Motion to Continue Hearing on Defendant's
17  Motion for Summary Judgment" (Dkt. # 165). Having reviewed the submissions of the parties
18  and the remainder of the record, the Court denies plaintiffs' motion to continue and grants in
19  part and denies in part defendant's motion for summary judgment for the reasons stated herein.

20     **I.     Background**

21     On January 13, 2010, defendant DL Evans Bank (the "Bank") obtained a default
22  judgment against plaintiff Henry Dean in a Blaine County, Idaho court in the amount of
23  $1,063,503.16 ("Idaho Default Judgment"). *See* Dkt. # 32-1 (Ex. A). On October 4, 2010, the
24  Bank domesticated the Idaho Default Judgment in King County Superior Court of Washington.
25  *See id.* (Ex. B). The Bank renewed and extended the Idaho Default Judgment in the Blaine
26  County District Court on January 5, 2015. *Id.* (Ex. C). The Bank then renewed and extended the
27  foreign Idaho Default Judgment in King County Superior Court on January 23, 2015. *Id.* (Ex.
28  D). On August 2, 2018, the Bank sought and obtained a writ of execution in the King County

Superior Court. Dkt. # 5-1 (Ex. A). In August 2018, the King County Sheriff levied upon the writ of execution, allegedly entering plaintiffs' residence to seize personal property including certain stock shares and stock options, as well as personal, business, and legal records. Dkt. # 4 at ¶ 2.6. Plaintiffs subsequently filed this federal lawsuit against the Bank, bringing claims under 42 U.S.C. § 1983 for violations of their Fourth Amendment and Fourteenth Amendment rights (*id.* at ¶¶ 4.1–5.15), for conversion (*id.* at ¶¶ 6.1–6.2), for unjust enrichment (*id.* at ¶¶ 7.1–7.2), and for declaratory and injunctive relief regarding the right of execution under the Idaho Default Judgment (*id.* at ¶¶ 8.–8.2). The Bank raised counterclaims against plaintiffs for declaratory judgment regarding the existence and validity of the debt (Dkt. # 18 at ¶¶ 30–44), declaratory judgment regarding enforcement of the Idaho Default Judgment in Washington (*id.* at ¶¶ 45–52), fraudulent transfers (*id.* at ¶¶ 53-77), and injunctive relief to prevent further fraudulent transfers (*id.* at ¶¶ 78–82).

On May 23, 2019, the parties filed cross-motions for partial summary judgment. *See* Dkts. # 31, 33. Upon review of the parties' cross-motions and the underlying complaint, the Court viewed "the gravamen of plaintiffs' complaint as a challenge to the King County Superior Court's issuance of a writ of execution on a state law judgment," and highlighted that the "Court is precluded from reviewing that judgment and its execution" per the *Rooker-Feldman* doctrine. Dkt. # 107 at 3. The Court addressed each of plaintiffs' causes of action in turn and ordered plaintiffs to show cause why all but one of the causes of action (plaintiffs' § 1983 claim) should not be dismissed for lack of subject matter jurisdiction. Dkt. # 107.

On December 30, 2019, plaintiffs filed their response to the Court's Order to Show Cause. Dkt. # 109. On February 6, 2020, plaintiffs filed a motion to dismiss the Bank's counterclaims for lack of subject-matter jurisdiction. Dkt. # 132.

On September 27, 2021, the Court entered its Order Regarding Plaintiffs' Response to Order to Show Cause, dismissing plaintiffs' claims under the *Rooker-Feldman* doctrine with the exception of plaintiffs' § 1983 claim, which the Court allowed to move forward "to the extent it pertains to the Bank's alleged conduct in enforcing the writ of execution during the entrance and

1  search of plaintiffs' residence." Dkt. # 149 at 6. In its Order, the Court also denied plaintiffs'

2  motion to dismiss defendant's counterclaims. *Id.* at 14.

3      On August 25, 2022, the Court entered an amended scheduling order that did not reopen

4  discovery or extend the deadline for amending pleadings, but did reset the deadline to file

5  dispositive motions. Dkt. # 155. On November 23, 2022, the Bank filed the instant renewed

6  summary judgment motion on plaintiffs' sole remaining claim and the Bank's fraudulent

7  transfer counterclaims. Dkt. # 158. On December 1, 2022, plaintiffs filed a "Motion to Add

8  Affirmative Defense to Their Answer to Counterclaim." Dkt. # 161. On December 13, 2022,

9  plaintiffs filed the instant motion to continue summary judgment. Dkt. # 165.

10     **II.    Plaintiffs' Motion to Continue**

11     The Court first addresses plaintiffs' motion to continue, which is brought under Federal

12  Rule of Civil Procedure 56(d). This rule provides:

13         If a nonmovant shows by affidavit or declaration that, for specified reasons, it
           cannot present facts essential to justify its opposition, the court may: (1) defer
14         considering the motion or deny it; (2) allow time to obtain affidavits or
           declarations or to take discovery; or (3) issue any other appropriate order.
15

16  Fed. R. Civ. P. 56(d). Here, plaintiffs acknowledge that "[t]here has been sufficient time for both

17  parties to conduct discovery" but identifies two reasons why the Court should continue the

18  motion. Dkt. # 165 at 4. First, plaintiffs argue that no summary judgment motion should be

19  considered until after the Court rules on plaintiffs' motion seeking to amend their affirmative

20  defenses. *Id.* at 3-4. This argument is easily dispensed with, as the Court has ruled on plaintiffs'

21  motion and denied leave to amend. *See* Dkt. # 175.

22     Second, plaintiffs ask that the summary judgment motion be continued until after the

23  Washington state courts have issued a decision in a new lawsuit brought by plaintiffs,[1] alleging

24

25

26     [1] The Court notes that plaintiffs' "Motion to Vacate Judgment" was filed in the Washington state
    court action on December 12, 2022, *see* Dkt. # 163-2, the day before the motion to continue summary
27  judgment was filed in this Court, *see* Dkt. # 165, and weeks after defendant's renewed motion for
    summary judgement was filed, *see* Dkt. # 158. This Court found plaintiffs' claims regarding the validity
28  of the state court judgments barred by the *Rooker-Feldman* doctrine on September 27, 2021. Dkt. # 149.
    The fact that plaintiffs waited over a year after their claims were dismissed – and until after defendant

that (1) the Idaho Default Judgment was void for lack of personal jurisdiction and (2) "the writs of execution were invalid because the Idaho default judgment was not validly renewed or revived." Dkt. # 165 at 5. Plaintiffs argue that "[t]hese determinations are relevant, and potentially dispositive to all issues in this case." *Id.* at 4. Specifically, plaintiffs argue that if any of the state court judgements are void, "then Defendant has no right to collect or enforce its Idaho Judgment in Washington." *Id.* However plaintiffs have made no showing that the validity of the state court judgments regarding the debt have any bearing on the remaining claims in this litigation.[2]

Plaintiffs' only remaining claim is a 42 U.S.C. § 1983 claim alleging Fourth Amendment violations "to the extent it pertains to the Bank's alleged conduct in enforcing the writ of execution during the entrance and search of plaintiffs' residence." Dkt. # 149 at 2, 6. The validity of the writ or underlying judgment is not relevant to plaintiffs' claim or defendant's defense. Defendant seeks summary judgment only on its fraudulent transfer counterclaims. *See* Dkt. # 158. As discussed below, the validity of the underlying state court judgments are also not relevant to these claims. *See* section IV.B.ii.b.

Accordingly, plaintiffs have not met their burden of demonstrating that they "cannot present facts essential to justify [their] opposition" and their motion to continue is denied. Fed. R. Civ. P. 56(d).

## A. Plaintiffs' Subject Matter Jurisdiction Claims

Plaintiffs' "Memorandum of Authorities Supporting Their Motion to Continue Motion on Summary Judgment," states that the Court "exercised ancillary jurisdiction over [defendant's

---

had filed a renewed motion for summary judgment in this Court – to pursue those claims in state court undermines their claims that resolution of the state court action is essential.

[2] Furthermore, the Court *sua sponte* takes judicial notice of the state court docket, *see* Fed. R. Evid. 201(c)(1) (explaining that a court "may take judicial notice on its own"); *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (explaining that we "may take judicial notice of undisputed matters of public record . . . including documents on file in federal or state courts"), and notes that the Washington state court denied plaintiff's motion to vacate the judgment. *See* Order Denying Defendant Henry W. Dean's Motion to Vacate Judgment, *DL Evans Bank v. Valle Club Homes LLC et al.*, No. 10-2-34696-1 SEA (King Cnty. Sup. Ct. Jan. 11, 2023).

state law counterclaims] based on it having jurisdiction over [plaintiffs'] 42 U.S.C. §1983

claims." Dkt. # 174 at 3. Plaintiffs go on to argue that "[t]his exercise of ancillary jurisdiction by

this Court runs contrary to the vast body of law that severely limits federal jurisdiction to

enforce state law collection efforts on state court judgments" and that under *Peacock v. Thomas*,

561 U.S. 349 (1996), "the Defendant's counterclaims and third-party claims should . . . be

dismissed." *Id.* at 3, 6.

As a threshold matter, plaintiffs appear to base their argument on the premise that state

court judgments cannot be enforced in federal court. *See* Dkt. # 174 at 3-4. However, defendant

is not seeking to enforce its state court judgment here. Thus, the relevance of many of plaintiffs'

cited cases is unclear.

Furthermore, plaintiffs' argument regarding ancillary jurisdiction appears to conflate the

two different flavors of ancillary jurisdiction. On the one hand, there is the "common-law

doctrine of ancillary jurisdiction over related *claims*, codified as part of a federal court's

supplemental jurisdiction under 28 U.S.C. § 1367." *K.C. ex rel. Erica C. v. Torlakson*, 762 F.3d

963, 964 (9th. Cir. 2014) (emphasis in original). On the other hand, there is "the more obscure

doctrine of ancillary jurisdiction over *collateral proceedings*," which "remains a matter of case

law." *Id.* (emphasis in original). The first type of ancillary jurisdiction (commonly referred to as

"supplemental jurisdiction" today), operates to "permit disposition by a single court of claims

that are, in varying respects and degrees, factually interdependent." *Kokkonen v. Guardian Life

Ins. Co. of Am.*, 511 U.S. 375, 379 (1994). The second type of ancillary jurisdiction "enable[s] a

court to function successfully, that is, to manage its proceedings, vindicate its authority, and

effectuate its decrees." *Id.* at 380.

The primary case cited by plaintiffs, *Peacock v. Thomas*, dealt with the second type of

ancillary jurisdiction – a court's exercise of jurisdiction over collateral proceedings.[3] 561 U.S.

349. Specifically, the Court was considering "whether federal courts possess ancillary

jurisdiction over *new actions* in which a federal judgment creditor seeks to impose liability for a

---

[3] *Winter v. Novartis Pharmaceutical Corp.*, 39 F. Supp. 3d 348, 352 (E.D.N. Y. 2014), also cited
by plaintiffs, similarly deals with the exercise of ancillary jurisdiction over collateral proceedings.

money judgment on a person not otherwise liable for the judgment." *Id.* at 351 (emphasis added). This body of law is inapplicable to the case at hand, in which there is no "new action" or "collateral proceeding." Here, subject matter jurisdiction exists as the Court has federal question jurisdiction over plaintiffs' § 1983 claims and has exercised supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over defendant's counterclaims. *See* Dkt. # 149 at 11-14.

To the extent plaintiffs challenge this Court's exercise of subject matter jurisdiction over defendant's counterclaims, the Court construes plaintiffs' arguments as a motion for reconsideration. *See* Dkt. # 132 (plaintiffs' motion to dismiss for lack of subject matter jurisdiction). Under this Court's local rules, "[m]otions for reconsideration are disfavored. The court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence." LCR 7(h)(1). Plaintiffs have neither met the procedural requirements for a motion for reconsideration, *see id.* 7(h)(2), nor the substantive requirements, as they raise no new facts or legal authority showing that the Court's exercise of supplemental jurisdiction was "manifest error."

Accordingly, plaintiffs' arguments regarding subject matter jurisdiction fail and their motion to continue is DENIED.

### III.   Motion to Seal

In tandem with its motion for summary judgment, defendant filed a motion to seal as its motion incorporates information that plaintiffs' previously designated confidential. Dkt. # 156.

"There is a strong presumption of public access to the court's files," and, absent a showing that the public's right of access is outweighed by the interests of the public and/or the parties in shielding the material from public view, a seal is not appropriate. LCR 5(g). Accordingly, parties are expected to explore all alternatives to filing a document under seal. *Id.* 5(g)(1). If the parties concludes that no alternative is possible, a "party may file a document under seal in only two circumstances." *Id.* 5(g)(2). The first circumstance is where "a statute, rule, or prior court order expressly authorizes" filing under seal. *Id.* 5(g)(2)(A). The second is where the party "files a motion or stipulated motion to seal the document before or at the same

1   time the party files the sealed document." *Id.* 5(g)(2)(B). This second procedure "permits the

2   party to file the document under seal without prior court approval pending the court's ruling on

3   the motion to seal." *Id.* Defendant has used the second procedure here. *See* Dkt. # 156.

4       However, any motion to seal a document, even a stipulated motion, must include a

5   certification that the parties have attempted to reach "agreement on the need to file the document

6   under seal, to minimize the amount of material filed under seal, and to explore redaction and

7   other alternatives to filing under seal." LCR 5(g)(3)(A). Defendant provides no certification in

8   its motion to seal. *See* Dkt. # 156. However, defendant did file a redacted version of the motion,

9   omitting the materials plaintiffs had marked as confidential. *See* Dkt. # 159.

10      In addition to a meet and confer certification, the moving party must also include a

11  "specific statement of the applicable legal standard and the reasons for keeping a document

12  under seal." *Id.* 5(g)(3)(B). Where, as here, the parties have entered a stipulated protective order,

13  *see* Dkt. # 98, the "party who designated the document confidential" must present the legal

14  standard and argument for keeping the document under seal. LCR 5(g)(3)(B). This must include

15  an explanation of: "(i) the legitimate private or public interests that warrant the relief sought; (ii)

16  the injury that will result if the relief sought is not granted; and (iii) why a less restrictive

17  alternative to the relief sought is not sufficient." *Id.* Plaintiffs have failed to provide this

18  statement in their response to defendant's motion. *See* Dkt. # 163.

19      Accordingly, the Court orders the parties to meet and confer on the need to file the

20  document under seal in compliance with Local Rule 5(g)(3)(A) within seven (7) days of this

21  Order. If the parties find that the motion must be filed under seal, plaintiffs must file a response

22  to defendant's motion to seal, providing the reasons for keeping the document under seal

23  pursuant to LCR 5(g)(3)(B) within fourteen (14) days of this Order.

24      The Clerk of Court is directed to keep Dkt. # 158 sealed pending the Court's ruling on

25  plaintiffs' response. LCR 5(g)(6).

26  **IV.   Defendant's Motion for Summary Judgment[4]**

27

28      [4] The Court notes that plaintiffs' opposition to defendant's renewed motion for summary
    judgment was filed a day late. Under this Court's local rules, summary judgment "opposition papers
    ORDER ON SUMMARY JUDGMENT - 7

1   The Court now turns to the merits of defendant's motion for summary judgment. Dkt.

2   # 158. Defendant moves for summary judgment on plaintiffs' sole remaining claim – their

3   § 1983 claim concerning the Bank's alleged conduct in enforcing the writ of execution during

4   the entrance and search of plaintiffs' residence. *Id.* at 18-19. Defendant also moves for summary

5   judgment on several of its fraudulent transfer counterclaims. *Id.* at 23-24.

6   A party is entitled to summary judgment if the "movant shows that there is no genuine

7   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

8   R. Civ. P. 56(a). Under Rule 56, the party seeking summary dismissal of the case "bears the

9   initial responsibility of informing the district court of the basis for its motion," *Celotex Corp. v.*

10   *Catrett*, 477 U.S. 317, 323 (1986), and "citing to particular parts of materials in the record" that

11   establish the absence of a genuine issue of material fact, Fed. R. Civ. P. 56(c). Once the moving

12   party satisfies its burden, it is entitled to summary judgment if the non-moving party fails to

13   designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324

14   (quoting Fed. R. Civ. P. 56(e)). The Court must "view the evidence in the light most favorable

15   to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*

16   *v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014). Although the Court must reserve

17   genuine issues regarding credibility, the weight of the evidence, and legitimate inferences for the

18   trier of fact, the "mere existence of a scintilla of evidence in support of the non-moving party's

19   position will be insufficient" to avoid judgment. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*,

20   477 U.S. 242, 252 (1986)). "Where the record taken as a whole could not lead a rational trier of

21   fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita*

22   *Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

23

24   shall be filed and served not later than the Monday before the noting date." LCR 7(d)(3). Here, the
25   motion was noted for December 16, 2022, thus plaintiffs' opposition needed to have been filed by
    December 12, 2022 but was filed a day late on December 13, 2022. Dkt. # 163. However, the Court
26   finds that plaintiffs have shown good cause and excusable neglect for the late filing, *see* Dkt. # 166
    (declaration of plaintiffs' counsel), and will accordingly consider plaintiffs' response. *See* Fed. R. Civ.
27   P. 6(b)(1); *Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007) ("District courts
    retain broad discretion to control their dockets"), *overruled on other grounds by Taylor v. Sturgell*, 553
28   U.S. 880, 904 (2008).

1

**A. Plaintiffs' § 1983 Claim**

2     The Court first addresses defendant's motion for summary judgment on plaintiffs' sole

3   remaining claim. Specifically, plaintiffs' § 1983 claim alleging that defendant violated

4   plaintiffs' Fourth Amendment rights during the entrance and search of plaintiffs' residence. *See*

5   Dkt. # 149 at 14. For the reasons stated herein, the Court finds that there are no genuine issues of

6   material fact and grants summary judgment to defendant on this issue.

7                         **i.     Execution of the Writ**

8     The facts surrounding the execution of the writ appear to be largely undisputed. *See* Dkt.

9   # 158 at 11-12; Dkt. # 163 at 1, 4-5. On August 2, 2018, King County Superior Court issued a

10   writ of execution to the Bank to enforce against personal property assets owned by Dean. *See*

11   Dkt. # 5-1 at 3-5. On August 21, 2018, Detective Hugo Esparza of the King County Sheriff's

12   Office executed the writ. Dkt. # 128-14 at 3. Detective Esparza, accompanied by the Bank's

13   counsel, Matt Green, and a Sammamish police officer (who was present per King County

14   Sheriff Office's policy), executed the writ at HTP's office in Redmond, Washington and

15   plaintiffs Henry Dean and Ginger Atherton's home in Sammamish, Washington. *Id.* at 3-4.

16     After entering the house, Detective Esparza served Dean with a copy of the writ and

17   provided an explanation of the purpose of the writ and "what the court ha[d] directed [Detective

18   Esparza] to do under the Writ." *Id.*; Dkt. # 128-7 at 79-80. Dean stated he fully understood the

19   writ. Dkt. # 128-14 at 4; Dkt. # 128-7 at 80.

20     After further discussion, the group went upstairs to Dean's office to review financial

21   documents kept in his study. Dkt. # 128-1 at 99; Dkt. # 128-7 at 85. At some point, Atherton

22   went downstairs to prepare drinks for herself and Dean, and then returned upstairs. Dkt. # 128-7

23   at 86; Dkt. # 128-1 at 100.

24     According to Dean, both law enforcement officers acted "professionally" during the

25   execution, and counsel for the Bank was "trying to be really friendly." Dkt. # 128-7 at 86, 93-94.

26   Atherton stated that the law enforcement officers were both "very polite" and "were trying to

27   calm me down." Dkt. # 128-1 at 99, 110. Dean and Atherton both testified that the law

28

1   enforcement officers did not make any threats to them, draw their guns, threaten to draw their
2   guns, or threaten to take Dean or Atherton to jail. Dkt. # 128-7 at 95-96; Dkt. # 128-1 at 108.

3       Dean and Atherton also stated that Atherton went into the garage with the officers and
4   Green to identify which cars she owned. *See* Dkt. # 128-1 at 94. Dean further stated that one of
5   the law enforcement officers told him to "stay here" (inside the house) and did not permit him to
6   accompany Atherton into the garage. Dkt. # 128-7 at 97. Atherton also testified that she was
7   told, "you stay here" (she could not recall who was speaking) at some point when she either
8   wanted to go check on the dogs or use the bathroom. Dkt. # 128-1 at 108-09.

9       Detective Esparza described the enforcement of the writ as "proceed[ing] in the normal
10  course and in a manner consistent with my usual practices." Dkt. # 128-14 at 3.

11                          **ii.   § 1983 Standard**

12      "To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right
13  secured by the Constitution and laws of the United States, and (2) that the deprivation was
14  committed by a person acting under color of state law." *Chudacoff v. Univ. Med. Ctr. of S. Nev.*,
15  649 F.3d 1143, 1149 (9th Cir. 2011). The Ninth Circuit has previously held that a private entity
16  may be held liable for violating an individual's constitutional right under § 1983 under the
17  Supreme Court's decision in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). *Tsao v.*
18  *Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012). Under *Monell*, liability cannot be
19  established solely because the entity employs a tortfeasor. 436 U.S. at 691. Instead, the
20  constitutional violation must be caused by "a policy, practice, or custom of the entity."
21  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Thus, to make out a claim
22  against the defendant Bank under *Monell*, plaintiffs must show that (1) the Bank acted under
23  color of state law, and (2) if a constitutional violation occurred, the violation was caused by an
24  official policy or custom of the Bank. *Tsao*, 698 F.3d at 1139.

25                          **a.   Color of State Law**

26      The Court "start[s] with the presumption that private conduct does not constitute
27  governmental action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir.
28  1999). "Nonetheless, we recognize at least four different criteria, or tests, used to identify state

ORDER ON SUMMARY JUDGMENT - 10

action" performed by a private entity: "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003). Here, plaintiffs argue that the Bank meets the "joint action" test. Dkt. # 163 at 3-4.

The Supreme Court has "set forth a broadly applicable two-prong framework for analyzing when governmental involvement in private action is itself sufficient in character and impact that the government fairly can be viewed as responsible for the harm of which the plaintiff complains." *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 994 (9th Cir. 2013) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937-42 (1982)). "The first prong asks whether the claimed constitutional deprivation resulted from 'the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Id.* (quoting *Lugar*, 457 U.S. at 937). "The second prong determines whether the party charged with the deprivation could be described in all fairness as a state actor." *Id.*

Here, the first prong of the *Lugar* test – the requirement that the "claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority" – appears to be met. 457 U.S. at 939. The challenged writ of execution was issued by the King County Superior Court pursuant to Washington law. *See id.* at 941 (explaining that the "procedural scheme created by the statute obviously is the product of state action").

As to the second prong of the *Lugar* test, it is less clear that plaintiffs can make an adequate showing. The "state actor" requirement is imposed because "[w]ithout a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." *Id.* at 937. It is true that the Supreme Court has found that "joint participation" exists where "the State has created a system whereby state officials will attach property on the [pre-judgment] *ex parte* application of one party to a private dispute." *Id.* at 942. However, this holding does not resolve the question in this case, which deals with a writ of execution issued by a state court pursuant to a final judgment. The Ninth Circuit has yet to issue a published decision in analogous circumstances to this case, and its unpublished cases point in two different directions. *Compare Padilla v. Sovereign Bank*, No. 20-

55953, 2021 WL 3362115, at *1-*2 (9th Cir. Aug. 3, 2021) (finding a bank's use of state judicial process and the Los Angeles County Sheriff's Department to enforce a state court judgment did not constitute joint action) *with Copelan v. Croasmun*, 84 F. App'x 762 (9th Cir. 2003) (finding a private individual could be considered a "state actor" where a writ of execution secured by private individual was executed against plaintiff by county sheriff's department). However, the Ninth Circuit has, in a published decision, held that "the fact that a state permits the use of foreclosure procedures and subsequent sheriff sales as the execution of a judgment is not sufficient to constitute state action," *Harper v. Fed. Land Bank of Spokane*, 878 F.2d 1172, 1178 (9th Cir. 1989), and district courts within the circuit have relied on this reasoning to find that the state action requirement is not met where a private party uses a state's "post-judgment collection procedures," *see, e.g.*, *Nelson v. Smith*, No. C06-432RSM, 2006 WL 2690981, at *2-*3 (W.D. Wash. Sept. 19, 2006). The Court finds this reasoning persuasive and concludes that plaintiffs have failed to raise an issue of material fact as to whether the Bank can be considered a "state actor."

### b.  Constitutional Violation

Even if plaintiffs could establish that the Bank was acting under color of state law, they have failed to raise a genuine issue of material fact as to whether a constitutional violation occurred. Plaintiffs argue that their Fourth Amendment rights were violated by (1) the search of plaintiffs Henry Dean and Ginger Atherton's home and seizure "of papers" pursuant to the writ of execution, which was not a search warrant and "did not specify any specific property to be executed upon"; and (2) that plaintiff Ginger Atherton was falsely imprisoned when "armed law enforcement officers ordered her to remain seated in the dining room and not to leave." Dkt. # 163 at 4-5.

The Fourth Amendment protects the right of the people to be secure in their "persons, houses, papers, and effects" against unreasonable searches and seizures. U.S. Const. amend. IV. The Fourth Amendment's protection against unreasonable search and seizure applies in the civil context, but the standards of reasonableness are less stringent than in the criminal context. *Tift v. Snohomish Cnty.*, 764 F. Supp. 2d 1247, 1252 (W.D. Wash. 2011).

As to plaintiffs' arguments regarding the writ of execution, plaintiffs cite no authority for their contention that the writ of execution did not provide the requisite authority to enter their house, *cf.* RCW § 6.17.160 (authorizing sheriff to break and enter if necessary to effectuate the writ), nor for their argument that the writ needed to specify the property to be seized, *cf.* RCW § 6.17.110(3)(a) ("If the execution is against the property of the judgment debtor, it shall require the officer to satisfy the judgment out of the personal property of the debtor"). As the writ was facially valid under Washington law and plaintiffs have not properly challenged the constitutionality of these standards, the Court finds that the execution of the writ was reasonable. *See, e.g.*, *Coonts v. Potts*, 316 F.3d 745, 750-51 (8th Cir. 2003) (holding there is no unreasonable seizure when levy of property is executed pursuant to a facially-valid writ of execution and in accordance with state and federal law); *Patel v. City of Los Angeles*, No. C21-1707, 2022 WL 878920, at *4 (C.D. Cal. Feb. 9, 2022); *Tift*, 764 F. Supp. 2d at 1252-53.

As to plaintiffs' argument that Ms. Atherton was subject to "excessive restraint," Dkt. # 163 at 3, both the Supreme Court and the Ninth Circuit have held that law enforcement may detain a building's occupants during a search as long as the detention is reasonable. *Dawson v. City of Seattle*, 435 F.3d 1054, 1065-70 (9th Cir. 2006) (citing *Michigan v. Summers*, 452 U.S. 692, 704-05 (1981)). Plaintiffs identify no facts that would render the alleged detention in this case unreasonable. *See* Dkt. # 163 at 4-5.

Viewing the facts in the light most favorable to plaintiffs, the Court finds no reasonable jury could find defendant's actions violated the Fourth Amendment. Accordingly, the Court grants summary judgment to defendant and dismisses plaintiffs' § 1983 claim.[5]

---

[5] As plaintiffs have failed to establish that defendant acted under the color of state law or the existence of a constitutional violation, the Court need not reach plaintiffs' argument that the Bank's failure to develop a "policy requiring that any writs specify the specific property to be seized and that non-debtors not be restrained" caused the claimed constitutional violations. Dkt. # 163 at 5. However, the Court notes that "[t]o establish that there is a policy based on a failure to preserve constitutional rights, a plaintiff must show, in addition to a constitutional violation, that this policy amounts to deliberate indifference to the plaintiff's constitutional right, and that the policy caused the violation." *Tsao*, 698 U.S. at 1143 (citations and punctuation omitted). This requirement ensures that "the acts of constitutional tortfeasors can still fairly be said to be those of the [defendant entity]." *Id.* at 1144 (punctuation and citations omitted). Here, the content of the writ is set by statute and the request that Ms. Atherton remain in the dining room came

ORDER ON SUMMARY JUDGMENT - 13

1

**B. Defendant's Fraudulent Transfer Counterclaims**

2     The Court now turns to defendant's fraudulent transfer counterclaims. Because the Court

3   finds that genuine issues of material fact preclude summary judgment on these claims, it denies

4   defendant's motion for summary judgement.

5

**i.     Legal Standard**

6     Under Washington's Uniform Fraudulent Transfers Act ("UFTA"),[6] "[a] transfer made or

7   obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer"

8   with actual intent to defraud or constructive fraud. RCW § 19.40.041(a). When determining

9   whether actual intent to defraud was present, "consideration may be given to the eleven factors

10  or 'badges of fraud'" listed in RCW § 19.40.041(b).[7] *Sedwick v. Gwinn*, 73 Wn. App. 879, 885

11  (1994). Constructive fraud can be established by demonstrating that the debtor made the

12  transaction "[w]ithout receiving a reasonably equivalent value in exchange for the transfer" and

13  the debtor "was engaged or was about to engage in a business or transaction for which the

14  remaining assets of the debtor were unreasonably small in relation to the business or

15  transaction," or "intended to incur, or believed or reasonably should have believed that the

16  debtor would incur, debts beyond the debtor's ability to pay as they came due." RCW

17

18

---

19  from a law enforcement officer, over whom the Bank has no supervisory power. Accordingly, it is hard
20  to see how the alleged constitutional violations could "fairly be said to be those of the [Bank]." *Id.*

    [6] RCW § 19.40, formerly known as UFTA, is now known as the Uniform Voidable Transactions
21  Act. *See* S.B. 5085, 65th Leg., Reg. Sess. (Wash. 2017). Because the transfers here occurred before July
    23, 2017, the Court applies the UFTA. RCW § 19.40.905(2). Therefore, for the purposes of this Order,
22  we cite to former chapter 19.40 RCW.

23     [7] These factors include: "(a) The transfer or obligation was to an insider; (b) The debtor retained
    possession or control of the property transferred after the transfer; (c) The transfer or obligation was
24  disclosed or concealed; (d) Before the transfer was made or obligation was incurred, the debtor had been
    sued or threatened with suit; (e) The transfer was of substantially all the debtor's assets; (f) The debtor
25  absconded; (g) The debtor removed or concealed assets; (h) The value of the consideration received by
    the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation
26  incurred; (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the
    obligation was incurred; (j) The transfer occurred shortly before or shortly after a substantial debt was
27  incurred; and (k) The debtor transferred the essential assets of the business to a lienor that transferred the
    assets to an insider of the debtor." RCW § 19.40.041(b).
28

ORDER ON SUMMARY JUDGMENT - 14

1   § 19.40.041(a)(2). Both present and future creditors may bring claims under either the actual

2   fraud or constructive fraud theory. RCW § 19.40.041(a).

3        Present creditors, in other words a creditor whose "claim arose before the transfer was

4   made," may also seek to void a transfer "if the debtor made the transfer . . . without receiving a

5   reasonably equivalent value in exchange for the transfer or obligation and the debtor was

6   insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *Id.*

7   § 19.40.051(a).

8        "[T]he burden of proof rests on the party alleging the fraudulent transfer." *Sedwick*, 73

9   Wn. App. at 885. "[A]ctual intent to defraud must be demonstrated by 'clear and satisfactory

10  proof.'" *Id.* (quoting *Clearwater v. Skyline Const. Co. Inc.*, 67 Wn. App. 305, 321, (1992)). "In

11  contrast, constructive fraud must be shown by 'substantial evidence.'" *Id.* (quoting *Clearwater*,

12  67 Wn. App. at 321).[8]

13              **ii.**      **Plaintiffs' Threshold Arguments**

14       Before addressing the substance of defendant's fraudulent transfer claims, the Court first

15  addresses legal arguments raised by plaintiffs which, in plaintiffs' view, preclude the Court from

16  reaching the merits of defendant's counterclaims.

17              **a.  Statute of Limitations**

18       Washington law imposes a four-year statute of limitations on fraudulent transfer claims.

19  RCW § 19.40.091. In other words, a claim must be brought "within four years after the transfer

20  was made." *Id.* However, as defendant points out, the Washington Supreme Court has held that

21  "if a counterclaim is not barred by the statute of limitations at the commencement of the action

22  in which it was pleaded . . . , it does not become barred even though the full statutory period

23  expires during the pendency of the action." *J. R. Simplot Co. v. Vogt*, 93 Wn. 2d 122, 126

24  (1980). Here, plaintiffs' complaint was filed on September 24, 2018. Thus, defendant may

25  challenge transfers made after September 24, 2014 without violating the statute of limitations.

26

27       [8] Under the new version of the law, a creditor alleging fraudulent transfer "has the burden of

28  proving the elements of the claim for relief by a preponderance of the evidence." RCW § 19.40.041(3); *id.* § 19.40.051(3).

1   Because all three groups of challenged transfers took place after September 24, 2014,

2   defendant's counterclaims are not barred by the statute of limitations.

3                                 **b. Validity of Underlying Judgment**

4          Next, plaintiffs argue that because they are challenging the validity of the underlying

5   judgment in state court, this Court is precluded from ruling on defendant's fraudulent transfer

6   counterclaims. Dkt. # 163 at 6-9. Under the UFTA, "claim" "means a right to payment, whether

7   or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

8   unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." RCW § 19.40.011(3);

9   *Douglas v. Hill*, 148 Wn. App. 760, 762 (2009) ("A creditor need only establish a right to

10  collect payment in order to void a fraudulent transfer under the Uniform Fraudulent Transfer

11  Act"); *Rowden v. Hogan Woods, LLC*, 476 P.3d 485, 499-500 (Or. Ct. App. 2020) (collecting

12  cases).[9]

13         Because the statute recognizes "a party's right to seek relief when a fraudulent transfer is

14  made in the midst of dispute over the right to payment," defendant's counterclaim is not

15  precluded by plaintiffs' state court challenges. *Rowden*, 476 P.3d at 500.

16                                **c. Meretricious Relationship**

17         As discussed below, plaintiffs argue that the challenged transactions cannot be fraudulent

18  because of the "community-like" nature of the property at issue. *See* Dkt. # 163 at 9-12.

19  Plaintiffs Dean and Atherton were not legally married until 2018 – after all of the alleged

20  fraudulent transactions took place. Dkt. # 163 at 10. However, Washington law recognizes

21  "community-like property jointly owned by partners in a meretricious relationship" but who are

22  not legally married. *Soltero v. Wimer*, 159 Wn. 2d 428, 430 (2007). Washington courts consider

23  five non-exclusive, relevant factors to analyze when a meretricious relationship exists:

24

25         [9] The Washington UFTA instructs courts to apply and construe the law "to effectuate its general
26  purpose to make uniform the law with respect to the subject of this chapter among states enacting it."
    RCW § 19.40.903. Thus, "[b]ecause RCW 19.40.903 provides that the UFTA should be construed in a
27  uniform manner throughout the states, case law from other jurisdictions can provide guidance in
    interpreting the UFTA." *Sedwick*, 73 Wn. App. at 887 n.8; *see also Thompson v. Hanson*, 168 Wn. 2d
28  738, 744 (2009) (explaining that "it is appropriate to look not only to decisions by courts of this state,
    but also to those of other states operating under the UFTA").

1 "continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of

2 resources and services for joint projects, and the intent of the parties." *In re Marriage of*

3 *Pennington*, 142 Wn. 2d 592, 770 (2000) (quoting *Connell v. Francisco*, 127 Wn. 2d 339, 346

4 (1995)).

5 Here, plaintiffs argue that they were in a meretricious relationship during the relevant

6 time period. Dkt. # 163 at 10. In response, defendant argues that "[e]ven assuming that Dean and

7 Atherton were in a recognizable committed intimate relationship," courts have recognized that

8 community property can still be fraudulently "transferred" between spouses. Dkt. # 158 at 25;

9 *see also* Dkt. # 168 at 14 (arguing that the status of "Dean and Atherton's 'meretricious

10 relationship' is irrelevant"). While the Court agrees that the existence of a meretricious

11 relationship standing alone does not forestall a finding that the transactions were fraudulent, as

12 discussed below, the existence of "community-like property" may affect the analysis of whether

13 a debtor received "equivalent value" in exchange for the transfer. Because defendant does not

14 argue against plaintiffs' assertion that a meretricious relationship existed, the Court assumes

15 without deciding for the purposes of this Order that plaintiffs are able to establish the

16 "community-like" nature of the relevant property.

17 **iii.    Fraudulent Transfers**

18 The Court now turns to the merits of defendant's fraudulent transfer counterclaims. As a

19 threshold matter, defendant notes that Dean "claims not to own any assets," Dkt. # 158 at 14; *see*

20 *also* Dkt. # 125-3 at 122-27. Defendant further notes that "Dean has not owned or been a

21 signatory on a checking account, savings account, certificate of deposit, safe deposit box, money

22 market account, investment brokerage account, or other type of financial account since at least

23 2011." Dkt. # 158 at 14; *see also* Dkt. # 125-3 at 122-27. Plaintiffs have not disputed this

24 assertion in their response. *See generally* Dkt. # 163.

25 In light of Dean's insolvency, defendant argues that he has made at least three fraudulent

26 transfers by causing various entities to make payments of money Dean has earned "directly to

27 bank accounts in the names of other individuals and entities, for which Dean is neither an owner

28 nor a signatory." Dkt. # 158 at 14. Defendant further asserts that Dean has "made these transfers

1  without receiving any value in exchange for the transfers." *Id.* Plaintiffs do not dispute the

2  underlying factual allegations surrounding these transfers but contend that they should not be

3  considered fraudulent. Dkt. # 163 at 9-13.

4      The Court addresses each of the alleged fraudulent transfers in turn.

5      **a.  Transfer from SGB Trust to Atherton's Bank Account**

6      In approximately 2009, Dean began working as counsel and advisor to the Bingham

7  family, representing the family in various matters and, beginning in September 2010, serving as

8  a trustee of the family's SGB 2007 Trust. Dkt. # 125-3 at 105-06. Between June 2015 and June

9  2017, Dean directed a bank account owned by the SGB 2007 Trust to make a number of

10  payments to a bank account held by Ginger Atherton. *See* Dkt. # 125-5; Dkt. # 125 at 36-37, 39,

11  48-51; Dkt. # 125-3 at 128-32. These payments represented the monthly fee Dean earned as a

12  trustee, as well as money he earned from a settlement he helped negotiate on behalf of the

13  Bingham family. Dkt. # 125-3 at 118-19. Defendant argues that these transfers were fraudulent

14  under both the constructive and actual fraud standards.

15      **1.  Constructive Fraud**

16      Plaintiffs argue that "Dean turned over any cash compensation he received to Ginger

17  Atherton to manage for the community. The funds were used to pay household bills, which are

18  community-like expenses. There was therefore no fraudulent transfer." Dkt. # 163 at 12; *see*

19  *also* Dkt. # 163 at 11 ("Here, plaintiffs argue that these transfers "were for purposes of

20  household management, management of community funds, and estate planning, for which one

21  spouse would not provide the other with reasonably equivalent value.").

22      To the extent plaintiffs argue community property cannot be the subject of a fraudulent

23  transfer claim, Washington courts have clearly held to the contrary. *See, e.g.*, *Clayton v. Wilson*,

24  168 Wn. 2d 57, 68-72 (2010).

25      However, plaintiffs' argument could also be viewed as a contention that Atherton's

26  payment of the couple's "community-like expenses" constitutes "equivalent value" to Dean.

27  Under the UFTA, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer

28  or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does

1   not include an unperformed promise made otherwise than in the ordinary course of the

2   promisor's business to furnish support to the debtor or another person." RCW § 19.40.031(a).

3   Pennsylvania courts interpreting that state's identical UFTA have held "that the subsequent

4   satisfaction of an insolvent debtor's reasonable and necessary household expenses can be

5   viewed as a reasonably equivalent value that is received by said debtor in return for a deposit of

6   his or her funds into an entireties account." *In re Meinen*, 232 B.R. 827, 842 (Bankr. W.D. Pa.

7   1999). Thus, where a debtor deposited funds into a joint bank account "to satisfy the debtor's

8   reasonable and necessary household expenses . . . said deposits may not be avoided . . . as

9   fraudulent transfers." *Id.* at 842-43. The Court finds the reasoning behind this holding

10  persuasive.

11         Under the rule announced in *Meinen*, "in order to prevail on [its] constructive fraudulent

12  transfer counts in the instant matter, [the Bank] must . . . prove that the direct deposits of the

13  [d]ebtor's compensation into [Atherton's account] either (a) were not used to satisfy necessities,

14  or (b) were spent on other assets that are presently held as entireties property." *In re Arbogast*,

15  466 B.R. 287, 308 (Bankr. W.D. Pa.), *aff'd sub nom. Cardiello v. Arbogast*, 479 B.R. 661 (W.D.

16  Pa. 2012), *aff'd*, 533 F. App'x 150 (3d Cir. 2013). Here, defendant has not made this required

17  showing.[10]

18         Accordingly, the Court finds that there is a genuine issue of material fact as to whether

19  Dean received "a reasonably equivalent value in exchange for the transfer" precluding summary

20  judgment on the issue of constructive fraud with regard to these transfers.

21                              **2.  Actual Fraud**

22         Defendant also argues that the transfer was made with "actual intent to hinder, delay, or

23  defraud." Dkt. # 158 at 25. Looking at the eleven "badges of fraud," defendant argues that "(1)

24

25         [10] While the burden of proof lies with the creditor, the "Court can and will impose on
    constructive fraudulent transfer defendants . . . the burden of producing at least some useful evidence
26  regarding what the funds deposited into an entireties bank account are ultimately spent on; the precision
    regarding such evidence will necessarily vary depending upon the circumstances." *Arbogast*, 466 B.R. at
27  308. Thus, to the extent defendant requires additional evidence or discovery to prosecute its fraudulent
    transaction claims, the Court recognizes that plaintiffs likely "possess complete control over information
28  as to the ultimate use of bank deposits." *Id.*

1   Dean had already been sued by the Bank; (2) the transfers were for 'substantially all of [Dean's]

2   assets' at the time, since he claims to have had no assets; (3) Dean was 'insolvent' at the time

3   the transfer was made; (4) the 'value of the consideration received by' Dean (zero dollars) was

4   not 'reasonably equivalent to the value of the asset[s] transferred;' and (5) Dean retained

5   constructive 'possession or control of the property . . . after the transfer,' making charges on a

6   credit card that were paid off using Atherton's account." *Id.* (citing RCW § 19.40.041(2)).

7        In response, plaintiffs argue that summary judgment cannot be granted on a claim made

8   under RCW § 19.40.041(1)(a) because a determination of actual intent to defraud requires an

9   assessment of witness credibility. Dkt. # 163 at 10-11. Plaintiffs rely on *Sedwick v. Gwinn*, 73

10  Wn. App. 879, 885-88 (1994), which held that "[i]n cases where the debtor denies that his or her

11  intent was to defraud, the issue cannot be conclusively determined by the trier of fact until it has

12  heard the testimony and assessed the witnesses' credibility."

13       Here, the Court finds that the factual issues regarding the "value of consideration

14  received by" Dean in return for the transfers, and plaintiffs' denial of an intent to defraud, *see*

15  Dkt. # 128-7 at 128, constitute genuine issues of material fact and preclude summary judgment

16  on the question of whether the transfers were made with actual intent to defraud.

17                    **b.  Transfer of GMC Commission to WN3 Account**

18       In 2014, Dean earned $250,000 from the sale of a 10-acre parcel of land to General

19  Motors Corporation ("GMC"). Dkt. # 128-7 at 114-15. On October 21, 2014, at Dean's

20  direction, the $250,000 was wired to a bank account controlled by Atherton and held in the

21  name of the entity WN3, LLC, which Atherton testified that she created, as sole member, to hold

22  "my single, my individual assets." Dkt. # 128-7 at 115-16, 132-33; Dkt. # 128-1 at 41; Dkt.

23  # 125-2. Plaintiffs argue that "community-like funds that may have been deposited into WN3,

24  LLC's account are also not fraudulent if they were used to pay community-like expenses." Dkt.

25  # 163 at 12.

26       Defendant, in response, argues that even if household necessities are exempt from the

27  fraudulent transfers statute, plaintiffs have failed to demonstrate that the funds were used for

28  necessities. Dkt. # 168 at 14. However, defendant bears the burden of proof. *Sedwick*, 73 Wn.

App. at 885.[11] While defendant identifies expenditures that it argues were not "necessities" in its reply brief,[12] the issue has not been sufficiently briefed by the parties to permit a finding of constructive fraud on summary judgment. Accordingly, the Court finds there are genuine issues of material fact precluding summary judgment on this counterclaim.

### c.  Transfer of HTP Stock to BGH Holdings

On December 31, 2014, Dean caused his 1,485,688 shares of HTP, Inc. stock[13] to be transferred to BGH Holdings LLC, an entity in which Dean and Atherton are the only members. Dkt. # 125 at 123-24, 127. BGH Holdings owned a bank account, but only Atherton was a signer. Dkt. # 125-3 at 142-44. Dean did not receive any compensation for the issuance of his shares to BGH Holdings. Dkt. # 125 at 126-27.

Defendant argues that "Dean's statements on August 21, 2018 regarding the HTP stock indicate his clear intent to 'hinder, delay, or defraud' the Bank by transferring it to BGH Holdings." Dkt. # 158 at 27. Specifically, defendant notes that "Dean told Detective Esparza that the HTP stock Detective Esparza had seized from the HTP office that morning 'didn't belong to Dean, but, instead, belonged to a business he and Ms. Atherton owned,' indicating that the stock was outside the scope of the judgment even though he maintains an ownership interest." *Id.*

Plaintiffs argue that "because the transfer to BGH did not alter the equitable ownership of the HTP, Inc. stock, it was not fraudulent." Dkt. # 163 at 10. However, the fact that the "equitable ownership" of the stock did not change does not mean the transfer was not fraudulent.

---

[11] Defendant notes that "[a]lthough the burden of proof rests upon the party seeking to set aside a fraudulent transfer, the burden shifts to the defendant to prove good faith when the consideration for the transfer is shown to be grossly inadequate." *Casterline v. Roberts*, 168 Wn. App. 376, 384 (2012). Per the earlier discussion of the factual issues regarding the "value of consideration received by" Dean in return for the transfers, the Court finds that defendant has not sufficiently demonstrated that the consideration was "grossly inadequate."

[12] Defendant notes that "Atherton testified they used the transferred funds to pay for, inter alia, Dean's membership to the Seattle Yacht Club, college expenses (but not tuition) for Atherton's children, and private school for Dean's children and grandchildren." Dkt. # 168 at 14.

[13] Dean worked as an employee and board member of HTP, Inc., which has previously operated as the separate legal entities DEEC, Inc. and HyTec Power, Inc., between 2012 and 2019. Dkt. # 125-3 at 110-14, 137-38.

*See United States v. Black*, 725 F. Supp. 2d 1279, 1292 (E.D. Wash. 2010) (finding fraudulent transfer where debtors transferred "nominal title" of assets to alter ego trusts but "retained full control and possession" of the property); *In re Huber*, 493 B.R. 798, 814-16 (Bankr. W.D. Wash. 2013).

Furthermore, as defendant points out, (1) the Bank's claim arose before the transfer; (2) according to his testimony, Dean was insolvent at the time of the transfer; and (3) there is no evidence that BGH Holdings provided any sort of consideration in exchange for the transfer. *See* RCW § 19.40.051(a); *Black*, 725 F. Supp. 2d at 1292 (finding transfer of property to alter ego trust was in violation of RCW § 19.40.051(a) where debtors "own[ed] no assets whatsoever" and "no consideration was ever provided" for the transfer of property to the trust).

The Court agrees that defendant has demonstrated compelling evidence of both actual and constructive fraud with regard to the transfer. However, under Washington law, an "asset" subject to fraudulent transfer laws "does not include . . . property to the extent it is encumbered by a valid lien." RCW § 19.40.011(2)(i). "Simply put . . . if the debtor transfers assets encumbered by security interests, that transfer is beyond the reach of the statute." *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.*, 135 Wn. 2d 894, 912 (1998). Here, plaintiffs argue, "Mr. Dean's personal property was encumbered by over $1 Million in federal tax liens." Dkt. # 163 at 11-12. Defendant does not deny that there is evidence in the record supporting plaintiffs' claim of an IRS lien, *see* Dkt. # 168 at 15; *see also* Dkt. # 125-3 at 152-55. However, defendant contends that plaintiffs' "vague reference . . . does not help them meet their burden to show that any specific asset was encumbered by a tax lien at the time of transfer." Dkt. # 168 at 15. Defendant's argument fails to recognize that "[d]emonstrating that the disputed transactions were subject to the UFTA is an element of [creditor's] claim." *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.*, 85 Wn. App. 695, 704 (1997), *as amended on reconsideration* (Aug. 5, 1997), *aff'd and remanded*, 135 Wn. 2d 894 (1998); *see also Nara Bank, N.A. v. Hana Fin., Inc.*, No. B148292, 2003 WL 1091035, at *8 (Cal. Ct. App. Mar. 13, 2003) (explaining "[i]t was incumbent upon [creditor] to show [debtor's] assets were not fully encumbered in order to take advantage of the UFTA, as the UFTA simply does not apply to encumbered assets"). By

identifying the IRS lien, plaintiffs "have created an issue for trial as to whether any of the disputed transactions involved 'assets' subject to the UFTA." *Eagle Pac.*, 85 Wn. App. at 704.[14] Accordingly, genuine issues of material fact preclude summary judgment on this counterclaim.

### iv. Motion to Strike

Defendant asks the Court to strike paragraphs 3-5, 8-10, and 12-14 of plaintiff Henry Dean's declaration under Fed. R. Evid. ("FRE") 401-402, 601-602, 801-802, and 901; as well as paragraphs 17-20 under FRE 701, 703, and 901. Dkt. # 168 at 12. Pursuant to Federal Rule of Civil Procedure 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Accordingly, the Court will not consider legal conclusions masquerading as facts, hearsay statements, facts outside the declarant's personal knowledge, or statements that – for any other reason – would not be admissible in evidence. Furthermore, the Court will "only consider facts that do not appear to be a blatant attempt to create a dispute of fact and that are not conclusory." *Sportsman v. A Place for Rover, Inc.*, 537 F. Supp. 3d 1081, 1087-88 (N.D. Cal. 2021).

Here, although plaintiffs provided the objected-to declaration "in opposition to defendant's motion for summary judgment," Dkt. # 164, their opposition brief does not cite to the declaration, much less the contested paragraphs within the declaration. *See* Dkt. # 163. Given this and the extensive record developed by the parties regarding the factual issues underlying the claims, the Court does not rely on the challenged declaration for its ruling and denies the motion to strike as moot.

### C. Counterclaims for Declaratory Judgment

Finally, in its motion for summary judgment, defendant states that it "moves for summary judgment in its favor on Plaintiffs' remaining claim and Counterclaims 1, 3-5, and 8 thereby

---

[14] Plaintiffs also note that "HTP, Inc. became insolvent and filed a chapter 11 bankruptcy case on August 24, 2021." Dkt. # 163 at 11-12. However, as defendant notes, any encumbrance stemming from the 2021 bankruptcy proceeding is irrelevant to the challenged 2014 transaction. *See Eagle Pac.*, 135 Wn. 2d. at 912 (explaining "if a debtor transfers assets unencumbered by security interests, that transfer may be analyzed for fraud").

disposing of all remaining claims." Dkt. # 158 at 17.[15] However, defendant does not address counterclaim 1 in its argument. *See generally* Dkt. # 158; Dkt. # 167. While defendant does not present arguments relating to its first counterclaim in this motion for summary judgment, the Court takes the opportunity to conduct the analysis required by the Declaratory Judgment Act "as to whether or not to exercise jurisdiction." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 672 (9th Cir. 2005).

Defendant's first counterclaim asks the Court to enter declaratory judgment that "Dean's debt as reflected by the Idaho Judgment and Washington Judgment is presently valid." Dkt. # 18 at 15-16. A district court has discretion to decline to exercise jurisdiction over Declaratory Judgment Act claims based on prudential considerations. *See* 28 U.S.C. § 2201(a). The exercise of this discretion is guided by the non-exclusive factors announced by the Supreme Court in *Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491 (1942). The *Brillhart* factors include "(1) the district court should avoid needless determination of state law issues; (2) it should discourage litigants from filing declaratory actions as a means of forum shopping; and (3) it should avoid duplicative litigation." *Principal*, 394 F.3d at 672 (internal citations and punctuation omitted). Essentially, the Court must "balance concerns of judicial administration, comity, and fairness to the litigants." *Id.* (internal citations and punctuation omitted). The Ninth Circuit has noted additional potentially relevant considerations, including:

> whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems. In addition, the district court might also consider the convenience of the parties, and the availability and relative convenience of other remedies.

*Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 n.5 (9th Cir. 1998) (*quoting Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 145 (9th Cir. 1994) (Garth, J., concurring). Here, as discussed

---

[15] The Court notes that defendant's additional fraudulent counterclaims (counterclaims 6 and 7) appear to still be live. If defendant wishes to dismiss these claims, it must follow the procedures laid out in Fed. R. Civ. P. 41.

above, a ruling on the validity of the debt is not necessary to address the remaining legal issues between the parties (plaintiffs' Fourth Amendment § 1983 claim and defendant's fraudulent transfer counterclaims). Furthermore, plaintiffs are currently challenging the judgement in state court.[16] Thus, a ruling from this Court on the validity of the judgement could result in "entanglement between the federal and state court systems" and duplicative litigation. Accordingly, the Court declines to exercise its jurisdiction over defendant's first counterclaim.

Defendant's second counterclaim asks the Court to enter declaratory judgment that defendant's "Judgment may be enforced in Washington under Washington law regarding execution." Dkt. # 18 at 16. The Court similarly finds that a ruling on this issue is not necessary to address the remaining legal issues between the parties, could result in "entanglement between the federal and state court systems," or duplicative litigation. Accordingly, the Court declines to exercise its jurisdiction over defendant's second counterclaim.[17]

## V.    Conclusion

For all the foregoing reasons, it is HEREBY ORDERED THAT:

1. Plaintiffs' motion to continue summary judgment (Dkt. # 165) is DENIED.

2. Defendant's motion for summary judgment (Dkt. # 158) as to plaintiff's § 1983 claim is GRANTED.

---

[16] See Notice of Appeal, *DL Evans Bank v. Valle Club Homes LLC et al.*, No. 10-2-34696-1 SEA (King Cnty. Sup. Ct. Jan. 17, 2023).

[17] The Court notes that defendant argues that this counterclaim is "moot" because in 2022 the Bank "filed an action on the Judgment in Blaine County District Court, and the Idaho court recently confirmed the underlying Judgment was live by entering a judgment in favor of the Bank on the Bank's claim." Dkt. # 158 at 10. The 2022 Idaho Judgment was entered in Idaho on August 9, 2022 and has been filed in King County Superior Court. Dkt. # 169. Thus, defendant argues that "even if Plaintiffs were somehow correct that the Bank could not enforce the old Judgment using a Washington writ of execution, the Bank has the right to use this remedy to enforce the 2022 Idaho Judgment once domesticated." *Id.* at 11; *see also* Dkt. # 168 at 11-12. The Court notes that a finding of mootness requires meeting a "heavy" burden, *Cnty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979), including establishing that both parties "lack a legally cognizable interest in the outcome," *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Accordingly, the Court declines to address defendant's mootness arguments and dismisses counterclaims one and two pursuant to its discretionary power under the Declaratory Judgment Act.

3.  Defendant's motion for summary judgment (Dkt. # 158) as to counterclaims 3, 4, and 5 is DENIED.

4. Defendant's counterclaims 1 and 2 are DISMISSED.

5. The Court orders the parties to meet and confer on the need to file defendant's motion for summary judgment under seal in compliance with Local Rule 5(g)(3)(A) within seven (7) days of this Order. If the parties find that the motion must be filed under seal, plaintiffs must file a response to defendant's motion to seal, providing the reasons for keeping the document under seal pursuant to LCR 5(g)(3)(B) within fourteen (14) days of this Order. The Clerk of Court is directed to keep Dkt. # 158 sealed pending the Court's ruling on plaintiffs' response. LCR 5(g)(6).

IT IS SO ORDERED.

DATED this 3rd day of May, 2023.

Robert S. Lasnik
United States District Judge